## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

JOHN SOUZA and KAREN SOUZA, individually and as representatives on behalf of a class of similarly situated persons,

      Plaintiffs

          v.

ATI INC.

-and-

STATE STREET GLOBAL ADVISORS TRUST CO.,

      Defendants.

Case No. 2:24-cv-01214

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs John Souza and Karen Souza, individually and as representatives of a class of similarly situated persons, sue Defendants ATI Inc. ("ATI") and State Street Global Advisors Trust Co. ("State Street"), for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiffs complain and allege as follows:

## NATURE OF THE CASE

1.      ATI produces specialty metals and is a publicly traded, multinational behemoth. It operates throughout the United States, Europe, and Asia and in numerous markets, including aerospace and defense, oil and gas, chemical processing, electrical energy, and medical device products. ATI's roots trace back to at least the 1930s, when Allegheny Steel of Pittsburgh and

Ludlum Steel of New York, entities which had produced materials for the Empire State Building, the Chrysler Building, and the Model A Ford, merged to create the Allegheny Ludlum Corporation.

2.      This case is about ATI turning its back on its retired workers—many of whom worked grueling, manual labor jobs in plants around the country—and choosing to put the pensions of 8,200 retirees in peril to secure ATI an enormous profit. Although ATI is worth more than $7 billion, the company decided to fatten its wallet by placing its retirees' futures in the hands of a risky new insurance company that is dependent on its Bermuda-based subsidiary and which has an asset base far riskier than ATI's. ATI's plan was assisted by State Street, itself the offshoot of a financial institution of long standing. ATI stood to gain—and did gain—hundreds of millions of dollars from this scheme, and State Street profited handsomely as well. The only losers in the transaction were ATI's retirees, whose retirement benefits have been degraded and who face the danger—now and in the future—that their lifetime pensions will go unpaid while they have lost all the protections of federal law. Plaintiffs seek to right this wrong, and to restore ATI's pensioners to their rightful places of financial security by recouping ATI's ill-gotten gains and otherwise ensuring the safety of Plaintiffs' retirements.

## BACKGROUND

3.      ATI sponsors and operates the Allegheny Technologies Incorporated Pension Plan (the "Plan"). The Plan is a defined benefit plan protected by ERISA.[1]

4.      In October 2023, ATI shed approximately $1.3 billion of its Plan pension liabilities—retirement money it had promised to pay 8,200 Plan participants and beneficiaries— by shifting them to Athene Annuity and Life Company and Athene Annuity & Life Assurance

---

[1] ATI's name was "Allegheny Technologies Incorporated" from 1996, when Allegheny Ludlum Corporation merged with Teledyne Technologies Incorporated, until 2002, when the entity rebranded as "ATI."

Company of New York, subsidiaries of Athene Holding Ltd. (collectively, "Athene"). In doing so, it removed those Plan participants and former employees from the Plan and placed them beyond ERISA's protections.

5.    ATI thereby shed 85% of its defined benefit pension plan obligations and kicked more than 80% of Plan participants out of the Plan.

6.    As a consequence, ATI reaped hundreds of millions of dollars' worth of economic gain, at least some of which it chose to distribute to shareholders in the form of stock buybacks in 2023 and 2024.

7.    ATI accomplished this result by purchasing group annuity contracts ("GACs") from Athene under which Athene assumed the obligation to pay the Plan's participants and beneficiaries their retirement benefits outside of ERISA's protective regime. Pension industry insiders refer to such transactions as "de-risking" or "Pension Risk Transfers."

8.    Only the latter term, however, is accurate. ATI's transaction with Athene was a "de-risking" from ATI's perspective. But in truth it was a massive risk transfer from ATI to Plan participants and beneficiaries that was designed to secure millions of dollars for ATI.

9.    Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, ERISA requires that a fiduciary satisfy exacting fiduciary standards when selecting an annuity. *See* 29 U.S.C. § 1104 (mandating that fiduciaries act with the "care, skill, prudence, and diligence" that a prudent person would exercise in like circumstances and "solely in in interests of the participants and beneficiaries"); *see also* 29 CFR § 2509.95-1 ("IB 95-1") (explaining that the fiduciary duty imposed by ERISA requires fiduciaries to select the "safest annuity available" and that "purchasing an unsafe annuity" is "never justif[ied]").

10.     ATI's transaction with Athene did not satisfy these exacting standards.

11.     Before the transaction, Plan pension benefits were guaranteed by ATI, which was responsible for paying the benefits as they came due, even if Plan investments fell short of expectations. ATI was also obliged by ERISA's funding requirements to protect the Plan's financial health by making additional contributions to the Plan when necessary. And the benefits were further assured by the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency charged with insuring pension benefits, because ATI funded and the Plan paid premiums to the PBGC for each of the 8,200 participants.

12.     After the 2023 transfer, none of this is true. ATI no longer guarantees payment of the retirement benefits. ATI is no longer subject to ERISA's funding requirements as to these liabilities. The 8,200 annuitants are no longer Plan participants; they have been ejected from the federal pension regime, so the PBGC no longer provides a backstop to ensure that participants and beneficiaries actually receive their retirement benefits throughout their retirements. And the Plan need no longer pay PBGC premiums associated with the 8,200 participants.

13.     The ejected Plan participants and beneficiaries are now solely reliant on the solvency of Athene for their retirement benefits.

14.     But Athene is not an entity to be trusted with the retirement income of tens of thousands of Americans. Athene is one of a new class of private equity-backed insurers (the "Risk-Taking Insurers") engaged in the dicey "shadow banking" sector, and it is a highly risky annuity provider for the 8,200 former Plan participants.

15.     Whatever place insurers like Athene have in the financial system, that place is not the American retirement sector, given Athene's high-risk, low transparency strategies.

16.     The 8,200 Plan participants and beneficiaries whom ATI unloaded to Athene had no say in the transaction. And they bear all of the transaction's risk while enjoying none of the profits that ATI reaped through its purchase of a much less expensive, but far riskier, annuity than was available and that ATI could and should have purchased if it wanted to shed its liability to Plan participants.

17.     Thus, the upside of the transaction was enjoyed by ATI, which reaped hundreds of millions of dollars in economic gain; by State Street, an "independent fiduciary" of the Plan which was paid to recommend, assess, and bless the transaction; and by Athene, which was paid to assume the liabilities and is now gambling with retirees' livelihoods.

18.     Congress has, through ERISA, imposed strict fiduciary duties and other obligations upon plan sponsors, administrators, and others to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers.

19.     To satisfy that duty, ATI and State Street were obliged to act prudently and solely in the Plan participants' best interests and to select a safe and reasonable annuity provider.

20.     Athene is anything but.

21.     ATI and State Street did not select Athene because it was the best annuity provider for Plan participants; rather, they selected Athene because it was cheaper *for ATI* than safer, traditional annuity providers that have a proven record of the financial strength necessary to shoulder such large and important obligations over a period of many decades.

22.     Because Athene is invested in lower-quality, higher-risk assets than traditional annuity providers, and because the market accounts for that risk in annuity pricing, ATI saved a substantial sum of money by selecting Athene, rather than a traditional annuity provider, as the insurer to provide the annuities.

23.    ATI and State Street, both of whom are fiduciaries by virtue of their discretionary authority over plan management and administration and control of Plan assets, have thus breached their fiduciary duties under ERISA, and the transaction was prohibited by ERISA.

24.    Plaintiffs John Souza and Karen Souza bring this action, individually and on behalf of the 8,200 participants and beneficiaries whose pensions are no longer guaranteed by ATI or afforded the protections of ERISA, to remedy those violations.

25.    The pensions of these individuals were a guaranteed lifetime income meant to support them through the later years of their lives and to compensate them for decades of faithful work.

26.    ATI and State Street have benefitted at the retirees' expense to the tune of hundreds of millions of dollars. At the same time, the fiduciary breaches of ATI and State Street have caused Plaintiffs massive financial injury:  Because their retirement benefits are now no longer guaranteed by the Plan or ATI, covered by ERISA, or protected by the PBGC—and instead depend on Athene's solvency—the present value of those benefits has substantially and quantifiably diminished and there is a substantial risk that Plaintiffs will not receive their full retirement benefits.

27.    Plaintiffs seek injunctive relief requiring ATI to guarantee the retirement benefits that were part of workers' employment bargain with ATI and which those workers earned through their service to ATI.

28.    Plaintiffs also seek monetary relief from ATI and State Street including the gain those entities earned from the unlawful transaction and the losses resulting from their illegal conduct.

## PARTIES

29.     Plaintiff John Souza was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. He was born in 1958, and he resides in New Bedford, Massachusetts. He began working for ATI in January 1996, performing mill utility work. Later, he was promoted to operator of a Mill 25 machine, which produced flat rolled stainless steel for use in industrial and military applications. He has been adversely impacted by the degraded value and diminished security of his pension benefits and is concerned about Athene's stability. John was married to Karen Souza throughout his employment at ATI.

30.     Plaintiff Karen Souza is a plan beneficiary and an alternate payee within the meaning of 29 U.S.C. § 1056(d)(3)(B)(i). Karen was married to John Souza until their divorce in 2011. Karen is entitled to 50% of John's pension benefits as an alternate payee, as set forth in the Qualified Domestic Relations Order ("QDRO") that she obtained from the Bristol County Probate and Family Court.

31.     Defendant ATI is a publicly traded international company with more than 30 locations and manufacturing facilities across the United States, Europe, and Asia. Its materials are found on all commercial jets flying today, and it operates in numerous markets, including aerospace and defense, energy, downstream processing, electronics, and medical device manufacturing. Its market capitalization exceeds $7 billion. It recorded more than $4.2 billion in sales and more than $803 million in gross profit in 2023. It is the Plan's sponsor as well as its administrator, and it is one of the Plan's fiduciaries with respect to the transaction with Athene because it approved the selection of Athene as the annuity provider and elected to enter into the transaction with Athene. ATI entered into the transaction with Athene, agreed to purchase the GACs from Athene, transferred approximately $1.3 billion dollars' worth of liabilities to Athene,

and received hundreds of millions of dollars' worth of economic benefit from the transaction. ATI exercised discretionary authority and control respecting management of the Plan and disposition of Plan assets, and it is responsible for the general administration of the Plan.

32.    Defendant State Street Global Advisors Trust Co. ("State Street") is a company formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. It was at all relevant times a Plan fiduciary with respect to the annuity transaction at issue because it was the independent fiduciary with respect to the transaction.

## JURISDICTION AND VENUE

33.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under ERISA, 29 U.S.C. §§ 1001, *et seq.*

34.    Plaintiffs have standing to bring this action.  Each of them has suffered concrete and particularized injuries traceable to Defendants' conduct.  The transaction simultaneously removed them from an ERISA-governed pension plan backed by a large, stable, multinational corporation and placed their pension benefits in the hands of a private-equity controlled insurance company with a highly risky offshore structure, which immediately, substantially, and quantifiably degraded the present value of their pension benefits and subjected them to an increased and significant risk that they will not receive their benefit payments.  Plaintiffs, as well as any rational investor, would demand a greater reward for bearing that greater risk.  By undertaking the transaction, Defendants exposed Plaintiffs to a much higher risk that they will not receive their benefits—a risk to which Plaintiffs never assented and for which they have received no compensation.  Plaintiffs also have standing to compel Defendants to disgorge any assets derived

from their illegal conduct, as well as to rectify Defendants' fiduciary breaches.  All of Plaintiffs' injuries would be redressed by the court-ordered relief they seek in this action.

35.    The Court has personal jurisdiction over each Defendant. 29 U.S.C. § 1132(e)(2).

36.    Venue is proper under 29 U.S.C. § 1132(e)(2) because ATI resides and may be found in this District and the breach occurred in this District. ATI conducts business in this District through at least nine manufacturing facilities located here, making this the judicial district in the country with by far the most such facilities.  This District is also the only District in the country where ATI has both an Enterprise Resource Center and a Technical Center. Numerous members of the proposed Class reside and receive their pension benefits in this District.

## ERISA'S FIDUCIARY DUTY STANDARDS

37.    ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably duties of loyalty and prudence. 29 U.S.C. § 1104(a). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)  for the exclusive purpose of
>
>> (i)    providing benefits to participants and their beneficiaries; and
>>
>> (ii)   defraying reasonable expenses of administering the plan; [and]
>
> (B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

38.    Because the selection of an annuity provider involves the exercise of discretion and implicates fiduciary duties, the Department of Labor has issued regulatory guidance, known as IB

95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as those provisions relate to a fiduciary's selection of an annuity provider in connection with a "Pension Risk Transfer." Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

39. The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries. 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### *Background on the Transfer of Pension Benefit Responsibilities to Insurance Companies*

40. In a defined benefit pension plan, the plan sponsor (typically the employer) agrees to pay a set amount of pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants.

41. The employer must pay the pension benefits, even if investment performance falls short of expectations.

42. The employer must also make additional contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to

satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor.

43.     If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the Plan and pay required benefits, the PBGC steps in as a backstop to pay benefits due.

44.     These features of defined benefit plans make them both valuable and predictable for retirees. Such plans once dominated the American retirement system because they were correctly seen as a way to attract and retain the best workforce.

45.     But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, as part of a recent trend by employers that sponsor defined benefit plans to improve their bottom lines, numerous employers have chosen to shift their liability for monthly pension payments to some or all of the plan participants to insurance companies, through the purchase of GACs.

46.     For example, ATI has, since 2016, completed numerous annuitizations and has successfully slashed the number of participants in its Plan by more than 90%.

47.     The upside of such transactions—enjoyed by plan sponsors—is increased profits and a reduction of risk (to increase shareholder value); the downside—borne by plan participants— is the increased risk of losing promised retirement benefits, because the annuity provider becomes insolvent and defaults on its obligation to provide these benefits,  which are no longer guaranteed by their former employer and the PBGC. As alleged further below, this risk of insolvency is not hypothetical but real.

48.    Although these transactions are now a common way for employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether, they are not new.

49.    In the 1980s, hundreds of employers terminated their well-funded, federally insured defined benefit pension plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one of the country's largest insurers and which had an A+ credit rating in 1982, but which had embarked on a disastrous "junk bond" investment strategy.

50.    The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

51.    Executive Life was often selected by employers because it offered the lowest bid on GACs. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

52.    Those decisions proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield bonds procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its own risky bond strategy.

53.    The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. State regulators were required to seize the company in April 1991 to prevent a run. Executive Life's investment portfolio was sold for approximately 50 cents on the dollar. The debacle resulted in massive losses to pensioners, with policyholder damages estimated—more than 30 years ago—at $3.9 billion.

54.     Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), as an amendment to ERISA to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries. Through this amendment, ERISA now provides expressly that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's purchase of annuities may sue for relief to, *inter alia*, assure the receipt of the benefits to which they are entitled. 29 U.S.C. § 1132(a)(9).

55.     And in 1995, the Department of Labor promulgated Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 ("IB 95-1"), which—like PAPA—aimed to prevent the irresponsible transfer of pension liabilities to insurance companies that are not sufficiently secure to guarantee retirement benefits, a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated consistent with that purpose.

56.     IB 95-1 provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the fiduciary standards that apply under ERISA to the selection of an annuity provider when a fiduciary transfers defined benefit pension liabilities to an annuity provider. *See* IB 95-1(a).

57.     It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

58.     Indeed, the selection of annuity provider is a critically important fiduciary function. As one independent expert, David Eichhorn of NISA Investment Advisors, LLC, has explained,

such a selection is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit.

59. Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must "take steps calculated to obtain the safest annuity available, unless the interests of the participants and beneficiaries demand otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

60. In performing that analysis, plan fiduciaries must consider, among other things:

    i.  the quality and diversification of the annuity provider's investment portfolio;

    ii.  the size of the insurer relative to the proposed contract;

    iii.  the level of the insurer's capital and surplus;

    iv.  the lines of business of the annuity provider and other indications of an insurer's exposure to liability;

    v.  the structure of the annuity provider and other indications of an insurer's exposure to liability; and

    vi.  the availability of additional protection through state guaranty associations and the extent of their guarantees.

### The Private Equity-Backed, Risk-Taking Insurers

61. Since Executive Life's collapse, the "Pension Risk Transfer" market had been dominated by traditional annuity providers, including household names such as MassMutual Insurance Company ("MassMutual") and New York Life Insurance Company ("New York Life").

But more recently a new class of annuity providers, backed by private equity firms, has entered the market. These are the "Risk-Taking Insurers."

62.    Private equity firms began purchasing insurance companies primarily to finance their operations. Today, they have moved beyond this business into those of private credit and insurance by greatly expanding their purchase of life insurers. This has heightened the influence of private equity firms over the annuity insurance industry which own  life insurers while also serving as their asset managers. As of 2023, private equity firms had spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.

63.    These new Risk-Taking Insurers are considerably more likely than traditional annuity providers to become insolvent now and in the future. Many (i) have not been tested through a full economic cycle and have never weathered a recession; (ii) re-insure annuities with offshore insurance companies that are not required to set aside as much capital as the traditional U.S.-based insurance companies; and/or (iii) invest in assets that are riskier, less liquid and more opaque than those invested in by traditional providers, such as collateralized loan obligations ("CLOs"), asset-backed securities, private fixed-income placements, subordinated debt, and even the stock of affiliated companies.

64.    In addition, the mission of private equity does not align with the best interests of policyholders. Not only do private equity firms receive cash from premiums that can be invested into their other affiliated businesses, but they can also generate significant investment management fees for themselves. Because private equity firms focus on maximizing their immediate financial returns, their entry into the insurance business poses danger: a chief aim of the insurance business

is ensuring that promised retirement benefits are there at the end of the day for policyholders and failure on that front can put policyholders at very significant risk.

65.    Independent industry experts, scholars, and journalists have begun to sound the alarm that these new Risk-Taking Insurers are unstable and even threaten the wider financial system. For example, a paper authored by two economists, Natasha Sarin, of Yale Law School, and Divya Kirti, of the International Monetary Fund, found that "PE [private equity]-backed insurance firms take on greater asset risk [than non-private equity backed firms] by moving out of highly rated corporate bonds and into poorly rated private-label asset backed securities, increasing their holdings of private-label asset-backed securities by two-thirds of the industry average." This risk-taking is nearly instantaneous: according to Professor Sarin, "[w]ithin days of a P.E. acquisition of an insurance company, they tilt their bond portfolios to riskier assets."

66.    Three economists at the Board of Governors of the Federal Reserve System have also recounted how such insurers have, since 2009, developed "a new shadow banking business model that resembles investment banking in the run up to the 2007–09 financial crisis. These life insurers profit by lending to highly-leveraged firms. In particular, they originate risky loans, hold them, and securitize them in [collateralized loan obligations]." By extending credit to "risky projects," these insurers "earn a sizeable spread over the cost of their fixed-annuity liabilities." The paper "show[s] that these life insurance companies hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers against virtually no capital." It also shows that "[t]he shadow banking business of life insurers exponentially increases the industry's vulnerability to aggregate corporate-sector shocks." In short, certain insurers have, since the 2008 financial crisis, "filled a void left by banks in risky corporate loan markets." In doing so, they have "create[d] and become vulnerable to run risk," the likelihood that such insurers could see their assets shrink

quickly and irreversibly when markets turn down. The paper identifies Athene as an example of one insurer that has a shadow banking business.

### *Athene: A Paradigmatic Example of a Risk-Taking Insurer*

67.     Athene is, in fact, a perfect example of a Risk-Taking Insurer. Athene was purchased in 2022 by the private equity giant Apollo Global Management ("Apollo"), which was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). Leon Black was not only the co-head of Drexel during Executive Life's junk bond binge, but also the financier who purchased Executive Life's discounted assets after its implosion. Apollo found a way to make money off the retirement savings of millions of everyday Americans by buying out corporate retirement obligations cheaply and then backing up their resulting annuity obligations through collateralized loans and other risky assets.

68.     When Apollo announced its merger with Athene, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately one-fifth of Athene's portfolio is invested in risky asset-backed securities and leveraged loans made to companies highly in debt, and approximately 80% of its "Pension Risk Transfer" liabilities are reinsured through Bermuda affiliates owned by Athene's parent, Apollo. Apollo collects asset management fees on *all* of the investments that it manages for Athene.

### *Athene's Complex and Risky Offshore Practices Threaten Pensioners.*

69.     Athene and Apollo pioneered much of the risky conduct characteristic of the Risk-Taking Insurers. Athene is today a prime example of an insurer that has grown its shadow banking business by assuming an organizational structure that allows it to engage in risky conduct with

former pension plan assets. As with other insurers engaging in such shadow banking, a central feature of Athene's organizational structure is the location of its captive reinsurers, Athene Life Re Ltd. and Athene Annuity Re Ltd.—both headquartered in Hamilton, Bermuda to take advantage of Bermuda's favorable (more lax) regulatory regime.

70.    Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider.

71.    In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and CLOs, even though some CLOs have greater downside risk than bonds with the same credit rating.

72.    The reinsurance of "Pension Risk Transfer" liabilities in Bermuda poses unique risks to pensioners. Bermuda reinsurers report under Bermuda accounting standards rather than United States Statutory Accounting Principles ("U.S. SAP"), which is the required reporting regime for all U.S.-based insurance companies. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales, including CUSIP numbers, which are unique identifiers assigned to stocks and registered bonds. By contrast, under Bermuda standards, Athene's affiliated reinsurers report only in the aggregate with no individual stock and bond level purchase or sale information. Further, Bermuda standards allow for investments in assets that would not qualify as suitable under U.S. SAP.

73.    The lack of transparency in the reporting by Athene's Bermuda reinsurers is stark. To illustrate, Athene's current statutory financial statements for its principal U.S. insurer, Athene,

is 3,939 pages long, whereas the Athene Bermuda entities' consolidated report filed under Bermuda standards is 59 pages long.

74.    In addition, Athene's excessive reliance on affiliated offshore reinsurance today is troublesome for those whose retirement benefits are affected by "Pension Risk Transfers," for numerous reasons. Whereas arm's-length reinsurance, with pricing set by the marketplace, can improve policyholder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly-owned affiliate allows for self-dealing, as pricing is not set by the marketplace. This potential is exacerbated when the affiliated reinsurer is located in an offshore jurisdiction with more lax standards, which leaves the reinsurer's management free to do virtually anything with the extra funds. As a result, captive reinsurance allows insurers to gain multiple advantages, including the ability to price annuities lower than other competitors but at greater risk to the annuitants. That is the case for Athene because both it and its reinsurer are today owned by Apollo.

75.    Life insurance and annuity companies are required to maintain surpluses to ensure long-term solvency, but those with captive reinsurers use them to back their liabilities with assets that would not be "admitted" (that is, accepted) by insurance company examiners in their own domiciles. In other words, reinsuring liabilities with captive reinsurers frees up excess capital for profit generation, or stockholder dividends, but does not decrease risk. Athene Annuity Re Ltd of Bermuda had $87 billion on its books in 2020 and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021.

76.    For the year ending in 2022, Athene took credit for reinsurance with its Bermuda affiliates in the amount of $15.2 billion, whereas traditional insurers like New York Life had no offshore affiliated reinsurance whatsoever and took a total of $3.58 billion in credit for reinsurance

with third party arm's length reinsurance companies. The ratio of Athene's surplus to liabilities is also quite low when compared to other life insurance companies, as evidenced by the chart below:



77.    The same holds true when evaluating Athene's surplus for the year ending 2023. It maintained a surplus-to-liabilities ratio of 1.44% for that year. In contrast, the national average for life and annuity carriers was 7.49%, or over 400% higher than Athene's.

78.    Athene has increased the amount of its liabilities at a significant pace from 2018 through 2023. Over this period, Athene's liabilities as a percentage of assets have increased over 250%. In contrast, a traditional insurer like New York Life increased its liabilities as a percentage of assets by 30% during the same period. Athene's dramatic increase in liabilities further adds to the risk assumed by Plaintiffs and similar ATI retirees.

79.    The amount of an insurer's surplus is critically important. It measures an insurer's total assets less its liabilities. The surplus to liabilities ratio indicates an insurer's ability to pay claims from policyholders because it is the only buffer between an insurer's solvency and default during economic downturns. If an insurer's assets are written down, or its liabilities are written up, the amount of surplus will be reduced accordingly. And the likelihood of this occurring is increased when an insurer holds riskier assets. In fact, Athene's 2024 second-quarter profit fell 11% from

just one year ago due to a drop in income from alternative investments related to Apollo and the roll-off of annuity business written during the peak of the pandemic according to Life Annuity Specialist.

80.    Athene has maintained one of the smallest surplus levels among life insurance and annuity carriers, as indicated above. New York Life's surplus-to-liabilities ratio, for example, is more than eight times that of Athene. The comparison of this simple measure highlights the risk taken by Athene in contrast to safer annuity providers.

81.    As of year end 2023, Athene had ceded more than $40 billion in premiums to its Bermuda based reinsurer and moved 83% of its liabilities offshore.

82.    Athene also reports a very large amount of modified co-insurance ("ModCo") arrangements with its Bermuda affiliates: $104 billion as of year-end 2022 versus only $2 billion in surplus as reported by Athene. For year-end 2023, Athene reported over $141 billion in ModCo while only maintaining $2.9 billion in surplus. Other insurers, including New York Life and TIAA, reported zero in ModCo with offshore affiliates as of year-end 2022 and 2023.

83.    ModCo arrangements are those in which an insurer (the "ceding carrier")  that is transferring risk to a reinsurer maintains both the premiums and reserves associated with the reinsured policies on its balance sheets. These arrangements create the appearance that the ceding carrier is financially stronger than it actually is.  They are particularly risky for pensioners severed from ERISA plans by "Pension Risk Transfers."

84.    Such arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC") ratio. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. Athene's use of ModCo arrangements has the effect of artificially inflating its RBC ratio, which in turn allows

Athene to hold a substantially lower amount in minimum required surplus. That is because, in Bermuda, insurers who hold riskier assets with higher credit spreads (or higher returns) are able to value their liabilities at a lower rate. Athene's manipulation of its RBC ratio masks just how risky annuities from Athene are, as alleged further below.

85.    Although Athene's total liabilities increased by more than 250% from 2018–2023, the amount of surplus maintained to support its liabilities has not kept pace. On information and belief, if Athene were to reverse or back out of its $104 billion in ModCo it would be required to increase its minimum required surplus by 400%. Athene's excessive use of offshore affiliated reinsurance, including ModCo, therefore obscures its true financial condition and exposes pensioners, including Plaintiffs, to even more substantial risk.

86.    Put simply, Athene's use of financial alchemy makes it dramatically under-reserved today.

87.    Athene also has a very high concentration of risky assets relative to its surplus. For example, Athene reports $21 billion in "other loan-backed and structured securities" as of year-end 2022 against only $2 billion in surplus—ten times its surplus. New York Life, on the other hand, reported $11.7 billion in that category—less than half of its surplus, which stood at $23.88 billion as of year-end 2022. All of Athene's other loan-backed and structured securities were originated by Apollo and present a greater risk than more traditional assets that make up the lion's share of assets held by traditional insurers.

88.    Athene also held $18 billion in "Deposit Type Contracts" as of year-end 2022 versus $2 billion in surplus. Deposit Type Contracts are essentially funding agreement-backed notes which are callable by institutional investors. In the event of a liquidity stress environment, like that which existed during the March 2023 collapse of Silicon Valley Bank and during the 2008

financial crisis, it is very likely that sophisticated investors in these funding agreement-backed notes would request their money back and wipe out Athene's surplus long before "de-risked" pensioners would even suspect that a liquidity crisis was looming. Funding agreement-backed notes are not reported as debt as they are considered an insurance product. As a result, Athene's actual liquidity is dramatically overstated, and Plaintiffs and similar ATI retirees are at substantial risk of not receiving their pensions.

89.    And today Athene's affiliated transactions are, on information and belief, also dramatically understated. It is publicly known that Apollo has had a long-term practice of bundling asset-backed notes and selling those notes to Athene in exchange for upfront cash and future management fees.

90.    Athene is a prime example of a Risk-Taking Insurer that has used what experts refer to as the "Bermuda Triangle Strategy" to generate profits. The first side of the triangle is the U.S. life insurer (e.g., Athene), which builds a block of annuity business through "Pension Risk Transfers" like the one at issue here. The second side of the triangle is the affiliated offshore reinsurers (e.g., Athene Life Re Ltd.), which accept the purchased insurance liabilities from the insurer and thereby free up annuity capital for use in the organization's private debt business. And the third side of the triangle is the affiliated asset manager (e.g., Athene Asset Management) which originates, acquires, and manages private debt.

91.    A triangle may sound stable, but this triangle is far from it. The interdependence between Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. The risks that Athene's separate account (for the ATI "Pension Risk Transfer" at issue here), and then its general account would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely

correlated events that are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer, which is essentially itself. And any inability to satisfy Athene's general account obligations would cause a downgrade in its credit preventing it from raising funds in the credit markets.

92.     Moreover, to the extent Athene says it has a separate account that is used to pay benefits to ATI retirees, that account is not "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other similar PRTs, the separate account would hold assets supporting the contract. However, the separate account assets may also be used to support Athene's payment obligations under other separate GACs issued by Athene. And on a quarterly basis but no less frequently than annually, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

93.     In sum, Athene's use of riskier investments and interrelated corporate strategies is in stark contrast to traditional insurers. For instance, New York Life maintains substantially more traditional, lower-risk investments than Athene and engages in no captive reinsurance.

94.     Apollo has expressly recognized that "Pension Risk Transfers" involving its affiliated companies may generate conflicts of interest relating to the GAC purchase price and the amount of investment management/advisory fees that Apollo affiliates charge for managing the underlying pension assets and liabilities. Despite this admission, Apollo has undertaken no efforts to mitigate those conflicts.

***Athene is Not Sufficiently Creditworthy to Ensure Payment of Plaintiffs' Retirement Benefits.***

95.    Objective measures illustrate that the annuities that ATI purchased from Athene were not the safest annuities available—or even close.

96.    At least one set of independent analyses (the "NISA Reports") has explained why an ERISA plan sponsor may not, consistent with its fiduciary duties and the risk factors outlined in IB 95-1, transfer pension liabilities to Athene. The NISA Reports found that industry-wide "Pension Risk Transfers" to lower quality insurers, like the transfer at issue here, harm pensioners by as much as $5 billion annually through uncompensated credit risk.[2] The NISA Reports quantify the extent to which Athene is neither a safe nor a reasonable annuity choice for ERISA fiduciaries. The reports conclude that Athene is substantially riskier than multiple traditional annuity providers and approximately 14% riskier than, for example, New York Life:

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

---

[2] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

97.    They reach that conclusion by using the bond market as a measure of risk—a necessity given the NISA Reports' finding that insurance company balance sheets are exceedingly complex and opaque, especially given the use of Bermudian reinsurers.

98.    The bond market provides a market-based measure of creditworthiness because a bond's spread over U.S. Treasuries is the additional compensation an investor demands to accept the credit risk of holding a bond from a particular issuer as compared to the U.S. government. This additional compensation over U.S. Treasuries is referred to as the "risk premium" for a given bond. The market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed by the NISA Reports (New York Life), whose market price is 7.4% higher than U.S. Treasuries. The risk premium for Athene's bonds is thus almost three times the risk premium for New York Life.[3]

99.    In fact, this analysis understates the true risks to beneficiaries of a plan transferring benefits liabilities to Athene. The market spread on bonds is set by the marginal buyer, a buyer who by definition would have bond holdings that represent only a small portion of that buyer's overall, diversified portfolio. By contrast, the pension of a typical retiree receiving an annuity is a significant portion of their retirement income. Such retirees would, if they had a choice (which Plaintiffs did not have in this case), demand additional compensation for Athene's riskiness.

100.    The NISA analysis separately compared the agency rating of Athene to its market-adjusted implied rating based on the bond market. The analysis found that although Athene had an A+ rating (like Executive Life before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported annuity providers.[4]

---

[3] *Id.,* Figure 2.
[4] *Id.,* Figure 1.



FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

101.   The reported range in Figure 1 is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch"). By agency, the ratings range as follows from highest to lowest: S&P (AAA to D), Moody's (Aaa to C), and Fitch (AAA to C).

102.   An A+ rating for Athene noted above should not be interpreted as suggesting that Athene is on par with safer annuity providers. As shown, there are levels of safety above A, including AA and AAA. New York Life and MassMutual, for example, maintain higher credit ratings due to their stronger creditworthiness.

103.    The differences in credit ratings have a material impact on the likelihood of default. Athene has a Moody's rating of A1 (or A+ for S&P) in contrast to New York Life, which maintains a credit rating of Aaa (or AAA for S&P).

104.    Moody's has reported the average cumulative issuer-weighted default rates by issuer credit rating from 1970 through 2021. Over a 20-year time horizon, the default rates for riskier issuers are apparent. The default rates are only 0.7% for Moody's Aaa ratings compared to 5.0% for its A ratings. Thus, over a 20-year time horizon, the default rate of bonds with Athene's rating is almost seven times riskier than those of a high-credit quality issuer. And the differential among default rates for them would be even greater over a 30-year time horizon. This differential is yet another indicator of the risk that pensioners have assumed with Athene.

105.    Athene's transition out of the life insurance business also contributes to its higher risk as an annuity provider. An insurance company that provides life insurance is considered a natural hedge to an annuities business. In 2013, most of Athene's life insurance business was acquired by another company, Accordia Life and Annuity Company, and by 2016, Athene had completely transitioned out of the business. Therefore, the important hedge to Athene's annuities business of providing life insurance no longer exists.

106.    Put simply, Athene today is, according to multiple objective measures, the least safe annuity provider—even among the category of least safe annuity providers of those analyzed in the NISA Reports. The annuities purchased by ATI were thus not safe, much less the safest annuities available. The Plan participants whose benefits have been annuitized through the "Pension Risk Transfer" with Athene receive none of the upside of Athene's inherently risky "value proposition." The risk posed by Athene could be worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of

failure. But that is not the case for Plan participants, and it is never the case for defined benefit plan participants, because their benefits are fixed.

*Athene also relies on unreliable, private letter ratings.*

107.    Since at least 2017, Athene has also relied on unreliable and misleading credit ratings from suspect private credit rating organizations, which should have been a cause of serious concern to Defendants when they decided to annuitize Plaintiffs' pension benefits.

108.    The CLOs in which Athene invests are a type of structured debt divided into different tranches with varying risks and returns, so their creation depends on private letter ratings from private credit rating agencies rather than more stringent public ratings from the Securities Valuation Office of the National Association of Insurance Commissioners ("NAIC") and those provided by major rating agencies, such as S&P, Moody's, and Fitch. Two such private credit rating agencies from which Athene obtains ratings are Kroll Bond Rating Agency ("KBRA") and DBRS Inc. ("DBRS").

109.    In 2019, the Wall Street Journal ("WSJ") found significant discrepancies among structured securities ratings, including those of CLOs, between the major ratings agencies and the so-called "challenger" ratings agencies—DBRS, KBRA, and Morningstar. The WSJ found that across most structured-finance segments, challengers were more likely to give higher grades than the major ratings agencies on the same bonds, resulting in the classification of a bond as "junk" by major ratings agencies while challenger rating agencies would rate it as a very safe AAA bond.

110.    The NAIC found similar discrepancies: it reported that as of year-end 2021, small credit rating providers provided private letter ratings on 83% of the privately rated securities owned by U.S. insurance companies. The NAIC found that private ratings by large credit rating providers were, on average, 1.3 notches lower than those provided by small credit rating providers

for the same security. Notably, unlike private letter ratings, public ratings provided by small credit rating providers, were largely comparable to those provided by other ratings agencies.

111.    This problem persists because bond issuers can pay for their ratings by choosing to purchase ratings from only those agencies which are more likely to issue higher ratings. According to the WSJ, there is an added incentive to hire the most lenient rating firm, because interest payments are lower on higher-rated bonds. And as major ratings agencies lose out on business to more lenient challenger ratings agencies, they adjust their standards downwards so that they can continue to compete. These ratings are important because a higher-rated structured security requires lower levels of capital to be held by the insurer.

112.    Both KBRA and DBRS have been fined millions of dollars by the SEC based on their rating practices, and the SEC recently found that KBRA failed to establish, maintain, enforce and document the required policies and procedures surrounding their ratings of certain CLOs, resulting in inaccurate ratings that did not fully account for cash flows payable to noteholders and which would almost certainly pose a threat to policyholders in the case of insolvency. DBRS has also paid millions of dollars in civil penalties for violating Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) related to its internal credit rating practices.

113.    Despite years of documented wrongdoing by KBRA and DBRS, involving extensive failures to comply with SEC credit rating policies and procedures, Athene continued to retain both companies for rating services. Indeed, KBRA and DBRS provided private rating services to Athene from 2017 through 2023. Athene's reliance on these ratings agencies is a red flag, which Defendants either ignored or failed to identify, by failing to properly vet Athene before selecting it as the annuity provider.

***Athene has been the subject of investigation and was found to have violated the law.***

114.    Athene has been investigated by the State of New York for misconduct regarding its "Pension Risk Transfer" business and was found to have violated New York law. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. The agency concluded from its investigation that Athene Annuity and Life Company had violated New York law by conducting insurance business related to its "Pension Risk Transfer" business without a license. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were ordered to pay a $45 million civil monetary penalty and satisfy other conditions.

***The ATI-Athene Transaction***

115.    Around October 2023, ATI engaged State Street to assist ATI in shedding its pension liabilities.

116.    State Street Corporation has deep ties to ATI.  It is ranked as the fourth largest institutional shareholder of ATI, owning more than 6 million shares of ATI.  As of February 2023, State Street Corporation reported shared voting power with respect to 6,633,688 shares.

117.    State Street has publicly said that it is "[b]lazing the trail into the mega-pension transfer market."[5]

118.    Specifically, ATI sought assistance from State Street's "Independent Fiduciary Services team." A key service offered by State Street's Independent Fiduciary Services team— and, according to State Street, "often one of the reasons why companies decide to hire" supposedly

---

[5] https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved.

independent fiduciaries like them—is that hiring State Street, as a third-party and purportedly neutral advisor, "may help in the event of litigation." *Id.*

119.    When State Street represents that hiring it "may help in the event of litigation," State Street means that engaging it to assist with annuitizations helps provide employers with legal cover in the form of a justification that State Street complied with IB 95-1 when it assists with the selection of an annuity provider.

120.    In fact, State Street has conceded the applicability of IB 95-1 to annuitizations like the one at issue here, both publicly and in legally binding documents.

121.    State Street represents, for example, that its "team of independent fiduciary services specialists continue to support clients seeking to transfer liabilities to insurance companies in the form of annuitizations" in light of the new insurance landscape that, according to State Street, has "increased 'safest available annuity' options available to independent fiduciaries and other fiduciaries." *Id.* (quoting and citing IB 95-1).

122.    And State Street has represented in its engagement agreements for materially identical PRTs that it will perform its work in selecting an annuity provider "in accordance and compliance with ERISA, including the requirements of the U.S. Department of Labor's IB 95-1."

123.    In advising ATI to shed the pension liabilities, State Street was in fact acting as a fiduciary of the Plan. As the Plan's "independent fiduciary," State Street was held to the same stringent fiduciary standards as ATI. State Street received financial compensation for the fiduciary services that it provided to ATI and the Plan.

124.    Based on a decision reached by ATI  on State Street's recommendation, ATI entered into an agreement brokered with State Street's assistance with Athene on October 17,

2023. By that agreement, ATI purchased GACs from Athene in exchange for Athene assuming $1.3 billion or approximately 85% of the Plan's defined benefit pension obligations.

125. On information and belief, ATI used Plan assets for this transaction.

126. Athene is now solely responsible for paying the pension benefits; Plan participants covered by the transfer have been terminated as participants in the Plan; and such participants no longer enjoy any of the benefits intended by Congress under ERISA, including the protections and backstop provided by the PBGC. And ATI no longer has responsibility for assuring those benefits and funding them.

127. ATI retirees played no role in the selection of Athene, Plan assets transferred to Athene in connection with PRT transactions cannot be withdrawn by retirees, and retirees do not have the option to transfer their pension benefits to a safer, less risky annuity provider.

128. ATI benefitted dollar-for-dollar from the savings resulting from the selection of Athene as the annuity provider, which was the direct result of Athene offering cheaper annuity contracts due to Athene's high-risk strategies.

129. The day *after* ATI shed the obligations to Athene, ATI published a press release, announcing that it would, *in the future*, purchase GACs from Athene. The press release did not state that ATI had already purchased the GACs and had already shed the liabilities.

130. The GACs cover approximately 8,200 Plan participants and beneficiaries, none of whom had a say in the transfer of their benefits to Athene.

131. The transaction dispensed approximately 85% of ATI's defined benefit pension obligations to Athene.

132.    Since the transaction, ATI touted publicly that the transaction has helped ATI create shareholder value, and has contributed to its ability to repurchase $85 million worth of shares in 2023, as well as its plan to repurchase another $150 million in 2024 for the benefit of shareholders.

133.    ATI reaped hundreds of millions of dollars in savings and thus profits from the transaction.

134.    ATI will enjoy administrative cost savings due to the elimination of the 8,200 participants from the Plan. Because the benchmark range of such costs is $50–100 per participant per year, ATI will save $410,000–820,000 per year. Over an 18.8-year life expectancy for an average 70-year-old retiree, which is a reasonable estimate under current IRS guidance, the transfer will net ATI between $7.7–15.4 million in administrative cost savings.

135.    ATI may also enjoy substantial reductions in investment management fees given the Plan's smaller pool of assets.

136.    ATI will also profit from the transaction by saving on flat-rate and variable-rate premiums that it previously paid the PBGC to insure its retirees' benefits.

137.    Because of the transaction, ATI and the Plan are no longer required to pay annual flat-rate PBGC premiums for the 8,200 participants terminated from the Plan, which will save ATI more than $828,200 annually. ATI will thus enjoy over $15.6 million in additional profits from the transaction over the lives of the 8,200 retirees, using the IRS life expectancy of 18.8 years for an average 70-year-old retiree.

138.    And the amount of variable-rate premiums over the lives of the retirees is also substantial, measuring in the millions of dollars. That is because variable-rate premiums are linked to interest rates, and ATI had historically paid significant amounts of this additional premium. Between flat-rate and variable-rate PBGC premiums, ATI will now avoid paying tens of millions

of dollars that would have otherwise secured the pension benefits for the 8,200 participants it offloaded to Athene. While ATI enjoys the savings of tens of millions of dollars in future insurance premiums, the 8,200 participants have lost the protections of ERISA and the backstop provided by the PBGC.

139.    All told, ATI's additional profits from the avoided premiums likely measure in the tens of millions of dollars, if not more.

140.    And changes in the interest rate environment in the year leading up to the transaction gave ATI a financial incentive to move quickly. Annuity pricing and interest rates are inversely related; interest rates rose by 200–250 basis points in the year preceding the transfer; and the Plan's discount rate increased from 2.95% at the beginning of 2022 to 6.40% at the time of the transaction in 2023. Those conditions mean that if ATI had undertaken the transaction a year earlier it would have paid as much as $500 million more for the annuities than it in fact paid.

141.    Put simply, ATI was eager to shed the liabilities in 2023 after interest rates had climbed because that is when the conditions for maximizing its own profit became favorable.

142.    ATI obscured the true financial impact of the Athene transaction by making an eleventh-hour change in its pension accounting policy, which it reported in January of 2024. Following the Athene transaction in October 2023, and following its release of full-year 2023 guidance in November of 2023, ATI decided to make this material change in accounting policy. Because of this change, ATI did not need to disclose the reduction in its true benefit obligation relative to the amount of plan assets it used to pay Athene.

143.    Although State Street was nominally engaged by ATI to provide compliance advice to ATI to ensure that ATI selected an annuity provider in satisfaction of its fiduciary obligations,

State Street's true role was to give the appearance of legitimacy to ATI's selection of Athene as an annuity provider.

144.    On information and belief, ATI and State Street did not conduct an independent, impartial investigation aimed at identifying and selecting an annuity provider in Plan participants' best interests.

145.    The risk posed by Athene as of 2023 and in the years immediately prior is and was reported and would have been known or ascertainable by highly sophisticated business entities with fiduciary obligations, such as ATI and State Street.

146.    In the pension plan liability transfer industry, it is customary for plan fiduciaries to solicit bids and information from insurers to ensure that the transfer is in the plan participants' best interest. ATI and State Street either did not solicit bids and other information that would have revealed that Athene was not a safe or reasonable selection, or they ignored or unreasonably disregarded such bids and information.

147.    When ATI and State Street selected Athene as the entity to which they would transfer billions of dollars' worth of pension liabilities, they made a choice that was neither safe, reasonable, nor prudent.

148.    Nor did ATI and State Street make the safest available choice or the choice that was in the best interest of Plan participants; in fact, they did the opposite.

149.    Indeed, Athene today flunks multiple tests for whether an annuity provider is a safe or reasonable choice, including because (i) Athene lacks a sufficient track record to be entrusted with guaranteeing such a massive amount of pension liabilities; (ii) Athene today is, compared to traditional providers, invested in riskier assets to support participants' payments, (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene which

are not as transparent or required to set aside as much capital as U.S.-based insurers; (iv) Athene employs questionable accounting strategies to overvalue its assets and understate its liabilities; (v) Athene uses excessive amounts of ModCo to artificially inflate its Risk Based Capital ration; and (vi) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

150.    Based on this information and that available to sophisticated entities like ATI and State Street, the selection of Athene would have been an unreasonable choice, even if the selection of Athene had not led to an attendant economic benefit for ATI and even if Athene's pricing was not more favorable to ATI than that of a traditional annuity provider.

151.    It should come as no surprise that State Street—ignoring the public red flags attached to Athene—has routinely rubber-stamped Athene as an annuity provider to displace retirees' longstanding, valuable rights to ERISA-protected pension benefits.

152.    Since 2018, State Street has recommended Athene for several "Pension Risk Transfers," shifting at least more than 10 billion dollars in pension liabilities from the federally regulated pension system to Athene.

153.    State Street thus has a history of being hired by companies to act as a so-called "independent fiduciary," performing a process which—to the surprise of no one—identifies Athene as the annuity provider of choice.

154.    And State Street has apparent financial incentives to recommend Athene to serve as the annuity provider in "Pension Risk Transfers."

155.    State Street offers a financial product backed by Athene.

156.    State Street is also one of the largest shareholders of Apollo, Athene's parent company.

157.    And State Street provides custodial services for Athene's insurance products, according to its regulatory filings.

158.    Under such circumstances it was unreasonable and a violation of ATI's fiduciary duties for ATI to select State Street as an independent fiduciary of the Plan.

159.    ATI either failed to engage in a thorough, independent investigation of available independent fiduciaries for the Plan, or ignored the results of such an investigation.

160.    Had ATI conducted an impartial investigation of available independent fiduciaries it would have discovered that State Street had a relationship and dealings with Athene that could and, upon information and belief, did impact the independence of the fiduciary services that State Street offered, especially given the numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene was not a reasonable or safe annuity, much less the safest annuity available.

### *By shedding the responsibility to pay Plaintiffs' benefits to Athene, Defendants degraded the value of Plaintiffs' retirement benefits.*

161.    The "Pension Risk Transfer" to Athene immediately diminished the present value of Plaintiffs' benefits.

162.    The selection of Athene replaced the valuable benefits to which Plaintiffs were entitled with benefits that were substantially and quantifiably less valuable.

163.    Riskier assets are, all else equal, worth less than safer assets.  Athene annuities have a higher credit spread relative to U.S. Treasuries, and thus have higher risk than annuities offered by other insurers.  That was also true when Defendants undertook the "Pension Risk Transfer." Thus, the annuities from Athene are worth measurably less than the annuities would be worth if issued by another insurer.

164.    Before the ATI-Athene transaction, the risk that Plaintiffs would not receive the pension benefits to which they were entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits *and* that ATI would fail *and* that the PBGC would fail to pay Plaintiffs' benefits. There was no safer place for their pension benefits.

165.    After the transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is large.  Because of the transaction, Plaintiffs are no longer members of the Plan, and their retirement benefits are thus backed by only Athene—not the Plan, ATI, or the PBGC.

166.    Based on Athene's current and likely future financial position, there is a substantial probability that it will fail to make good on its obligation to pay Plaintiffs' retirement benefits, and the economic gains realized by ATI are at least a rough proxy for the harm to retirees from being terminated as plan participants and having their pension benefits secured through a risky annuity with Athene.

167.    Athene is, in fact, one of the least safe annuity providers in the market.

168.    The transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs will not receive the retirement benefits that they have earned and which they are owed.

169.    The selection of Athene injured Plaintiffs the moment the transaction was executed because, at that moment, the present material and economic value of Plaintiff's promised benefits was substantially and quantifiably diminished.  And the annuitization greatly increased the risk—and created a substantial risk—that Plaintiffs will not receive the retirement benefits that they have earned and which they are owed.

## CLASS ALLEGATIONS

170.    Plaintiffs are empowered by law to bring this claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), and (a)(9).

171.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23. They seek to represent the 8,200 Plan participants and beneficiaries ejected from the Plan by the ATI-Athene transaction (the "Class").

172.    <u>Numerosity:</u> The 8,2000-member Class is so numerous that joinder of all members is impracticable.

173.    <u>Commonality:</u> There are questions of law and fact common to the class because class members' claims are identical to one another and predicated on the common contention that they were injured by the transfer of their pension liabilities to Athene in violation of ERISA. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include:

    i.    Did ATI breach its fiduciary duties when it elected to enter into an annuity transaction with Athene?

    ii.    Did State Street breach its fiduciary duty when it assisted ATI in entering into the transaction?

    iii.    Was the transaction *per se* unlawful under ERISA?

    iv.    Did the analysis performed by ATI and State Street that led ATI and State Street to select Athene as the annuity provider satisfy those entities' fiduciary obligations?

    v.    Should the Court order injunctive relief that ensures Plaintiffs will be able to obtain the value of their retirement benefits?

vi. Should the Court order ATI to disgorge the hundreds of millions in economic gain that it secured from breaching its fiduciary duty?

174. <u>Typicality:</u> The named plaintiffs' claims are typical of the Class's claims. The named plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

175. <u>Adequacy:</u> The named plaintiffs will fairly and adequately protect the interests of the Class. The named plaintiffs have no interest antagonistic to those of the other members of the Class. The named plaintiffs are committed to the vigorous prosecution of this action. They have retained counsel who specialize in the substantive law of ERISA and pension plans, and who are experienced and competent in the prosecution of large class actions, including those arising under ERISA.

176. <u>Rule 23(b)(1):</u> The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class members would risk establishing incompatible standards of conduct for Defendants. Additionally, adjudications as to individual Class members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

177. <u>Rule 23(b)(2):</u> The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Plaintiffs seek affects the Class as a whole. Individual Class members do not have an interest in prosecuting their claims in this action individually because Class members' claims are identical and the injunctive relief sought will affect each Class member equally.

178. <u>Rule 23(b)(3):</u> The prerequisites for a (b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Class-wide

litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class members' claims in one action.

### COUNT I: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against ATI and State Street for the Selection of Athene*

179.    The foregoing allegations are incorporated by reference herein.

180.    ATI and State Street were, at all relevant times, Plan fiduciaries.

181.    Under 29 U.S.C. § 1104(a)(1), ATI and State Street were thus required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." This duty requires that ERISA plans be operated for the "exclusive benefit" of plan participants to pay their benefits and defray reasonable expenses, and ERISA relatedly provides that, except in limited circumstances inapplicable here, "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). ATI and State Street were also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

182.    IB 95-1 explicates and summarizes the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available" and fiduciaries may never select an unsafe

annuity. Fulfilling the duty of prudence requires an objective, thorough, and analytical search for a suitable annuity provider.

183.    ATI and State Street breached these fiduciary duties of loyalty and prudence when they selected Athene as the annuity provider to receive Plaintiffs' pension liabilities, thereby allowing ATI to receive hundreds of millions of dollars in economic benefit.

184.    Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available, and ATI and State Street did not take the necessary steps to obtain such an annuity. ATI and State Street selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving ATI money and enhancing corporate profits. In so doing, ATI and State Street breached their duty of prudence by selecting an unsuitable annuity provider and breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. ATI's goal was to save money and State Street's goal was to further its line of business that recommends Athene as an annuity provider. Consequently, their search and selection of Athene were biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

185.    The transfer of Plaintiffs' pension liabilities to Athene has caused Plaintiffs injury, namely the substantially and quantifiably decreased value of their pension benefits, which are far less secure as a result of the transaction increased; the substantial risk that Plaintiff will not receive the full retirement benefits to which they are entitled; and the loss of ERISA protections.

186.    ATI and State Street are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings

pocketed by them from purchasing Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

187.    In addition to breaching their own fiduciary duties, ATI and State Street knowingly participated in each other's fiduciary breaches: they knew each other's acts were a breach of fiduciary duty, enabled the breach, and failed to make any reasonable effort under the circumstances to remedy the breach. They are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

188.    ATI is also liable for failing to monitor State Street, which it appointed and retained to manage the Plan on a day-to-day basis, including the day-to-day responsibility of selecting service providers, such as annuity providers. ATI failed to ensure that the process of selecting Athene as the annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B) and IB 95-1. Had ATI fulfilled its fiduciary monitoring duties, Athene would have been rejected in favor of a safer annuity provider or ATI would have decided not to proceed with the transaction.

### COUNT II: KNOWING PARTICIPATION IN A FIDUCIARY BREACH RELATED TO AN INSURANCE ANNUITY
*Against ATI and State Street for the Selection of Athene*

189.    Plaintiffs restate and incorporate paragraphs 1 through 178.

190.    Section 1132(a)(9) not only empowers individuals to bring actions when their status as plan participants is terminated by annuitizations that violate ERISA, it also imposes substantive duties on certain nonfiduciaries.

191.    Specifically, it creates liability for nonfiduciaries who knowingly participate in a fiduciary breach in violation of ERISA, 29 U.S.C. § 1104.

192.     Plaintiffs thus allege, in the alternative to Count I, that, even if ATI or State Street were a nonfiduciary for the purpose of the annuitization, that entity is liable under Section 1132(a)(9), so long as the other entity is deemed a fiduciary. Among other things, ATI and State Street both knew of the circumstances that rendered the other's conduct a breach of fiduciary duty and participated in that breach.

193.     ATI hired State Street for the purpose of selecting an annuity provider; knew that State Street's investigation of available annuity providers was not objective or sufficiently thorough; knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for ATI; and knowingly accepted that benefit by entering into the annuitization with Athene.

## COUNT III: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against ATI for the Selection of State Street*

194.     Paragraphs 1 through 178 are incorporated by reference herein.

195.     ERISA's fiduciary duties apply to the selection of service providers. 29 U.S.C. § 1104(a)(1)(A)–(B).

196.     ATI breached its fiduciary duties by selecting State Street as the Plan's "independent fiduciary" for the purposes of the transaction.

197.     Because of ATI's relationship with State Street and State Street's track record of recommending "Pension Risk Transfers" between plan sponsors and Athene, ATI had an interest in selecting State Street at the "independent fiduciary" that was not predicated on the best interest of Plan participants.

198.     ATI's selection of State Street failed to consider how State Street's relationship with Apollo and Athene would impair its impartiality and judgment in selecting an annuity provider.

199.     ATI's fiduciary breach in selecting an independent fiduciary facilitated the subsequent selection of Athene, which harmed Plaintiffs.

### COUNT IV: PROHIBITED TRANSACTION
*Against ATI; State Street as party in interest*

200.     Paragraphs 1 through 178 are incorporated by reference herein.

201.     Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect . . . furnishing of services between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

202.     ATI was at all times a fiduciary to the Plan.

203.     ATI caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between State Street and the Plan.

204.     When ATI caused the Plan to engage in the annuity transaction, State Street was a party in interest, including because State Street was a fiduciary of the Plan and a person providing services to the Plan. 29 U.S.C. § 1002(14). ATI knew of that fact when it caused the Plan to engage in the annuity transaction.

205.     Even if ATI were not a fiduciary with respect to the relevant conduct, it is liable under 29 U.S.C § 1132(a)(3) as a nonfiduciary party in interest, including because it knowingly participated in the breach or violation of other persons, including State Street.

### COUNT V: PROHIBITED TRANSACTION
*Against ATI and State Street; Athene as party in interest*

206.     Paragraphs 1 through 178 are incorporated by reference herein.

207.     ATI and State Street also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange

of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D);

208.     When ATI and State Street caused the Plan to engage in the annuity transaction, Athene was a party in interest, including because Athene was a person providing services to the Plan. 29 U.S.C. § 1002(14). ATI knew of that fact when it caused the Plan to engage in the annuity transaction.

209.     Even if either ATI or State Street was not a fiduciary with respect to the relevant conduct, the nonfiduciary entity would be liable for knowingly participated in the other entity's breach and failing to make any reasonable effort under the circumstances to remedy the breach.

## COUNT VI: PROHIBITED TRANSACTION
*Against State Street; ATI as party in interest*

210.     Paragraphs 1 through 178 are incorporated by reference herein.

211.     State Street was at all relevant times a fiduciary to the Plan.

212.     State Street caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan, on one hand, and ATI, on the other hand; (ii) furnishing of services between the Plan and ATI; and (iii) the transfer to, or use by or for the benefit of ATI, of Plan assets;

213.     When State Street caused the Plan to enter into the annuity transaction, ATI was a party in interest, including because it was a fiduciary of the Plan and persons providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of these facts when it caused the Plan to engage in the annuity transaction.

214.    Even if State Street were not a fiduciary with respect to the relevant conduct, it is liable under 29 U.S.C § 1132(a)(3) as a nonfiduciary party in interest, including because it knowingly participated in the breach or violation of other persons, including State Street.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court:

    i.   Certify the Class under Federal Rule of Civil Procedure 23, appoint the Plaintiffs named herein as Class representatives and appoint Zuckerman Spaeder LLP as Class counsel to represent the members of the Class;

    ii.   Order Defendants to guarantee the annuities purchased from Athene through the purchase, at their expense, of appropriate guarantees from reliable insurers selected through appropriate procedures or the posting of an appropriate security;

    iii.   Issue an injunction assuring receipt by the Class members of the amounts to be provided by the annuities, plus reasonable prejudgment interest on those amounts, 29 U.S.C. § 1132(a)(9);

    iv.   Order ATI, through Plan amendment or otherwise, to place the GACs it unlawfully purchased inside the Plan as a Plan asset and to return the Class members to their former status as Plan participants;

    v.   Order ATI to remain secondarily liable for Plaintiffs' pension benefits;

      vi.   Order disgorgement of all sums derived from the unlawful transaction; and/or

     vii.   Order any appropriate relief this Court deems just and equitable.

Plaintiffs also seek available attorneys' fees and costs, as well as pre- and post-judgment interest on any monetary compensation to which they are entitled.

Dated:  August 23, 2024

                                       */s/ John A. Schwab*
John A. Schwab (PA. ID No. 89596)
John A. Schwab, Attorney at Law, LLC
436 Seventh Ave., #300
Pittsburgh, PA 15219
(412) 235-9150
jas@johnschwablaw.com

*/s/ Cyril V. Smith*
Cyril V. Smith (*pro hac vice* application forthcoming)
ZUCKERMAN SPAEDER LLP
100 E. Pratt Street, Suite 2440
Baltimore, MD  21202
(410) 949-1145
(410) 659-0436 (Fax)
csmith@zuckerman.com

Bryan M. Reines (*pro hac vice* application forthcoming)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 10000
Washington, D.C. 20036
(202) 778-1846
(202) 822-8106 (Fax)
breines@zuckerman.com

*/s/ Douglas S. Brooks*
Douglas S. Brooks (Bar No. 636697)
LIBBY HOOPES BROOKS & MULVEY, P.C.
260 Franklin Street
Boston, MA  02110

(617) 338-9300
(617) 338-9911
dbrooks@lhbmlegal.com

*/s/ Edward Stone*

Edward Stone (*pro hac vice* application
forthcoming)
EDWARD STONE LAW P.C.
175 W. Putnam Ave., 2nd Floor
Greenwich, CT 06830
(203) 504-8425
(203) 348-8477 (Fax)
eddie@edwardstonelaw.com

*/s/ Elizabeth Hopkins*

Elizabeth Hopkins (*pro hac vice* application
forthcoming)
Susan L. Meter (*pro hac vice* application
forthcoming)
KANTOR & KANTOR LLP
19839 Nordhoff St.
Northridge, CA 91324
(818) 886-2525
(818) 350-6272 (Fax)
ehopkins@kantorlaw.net
smeter@kantorlaw.net

*Attorneys for Plaintiffs*